930 F.2d 919
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony HUMPHREY and Fred Clinkscale, Defendants-Appellants.
 Nos. 90-3722, 90-3741.
 United States Court of Appeals, Sixth Circuit.
 April 11, 1991.
 
 Before MILBURN and BOGGS, Circuit Judges, and DeMASCIO, Senior District Judge*.
 PER CURIAM.
 
 
 1
 In these consolidated cases, Anthony Humphrey and Fred Clinkscale, defendants-appellants, appeal their convictions for possession of approximately four kilograms of cocaine with intent to distribute it, 21 U.S.C. Sec. 841(a)(1), and for using or carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. Sec. 924(c). For the reasons that follow, we affirm.
 
 I.
 
 2
 Two Allegheny County police officers assigned to the drug interdiction unit at Greater Pittsburgh International Airport became interested in the defendants as they deplaned from a flight that had originated in Miami, Florida, a well-known source city for drugs. Because the defendants were among the first travelers off the airplane, the officers inferred that they had been traveling first class. Their clothing, however, seemed dissimilar to that usually worn by passengers traveling in that class, and the officers decided to place these men under surveillance.
 
 
 3
 Both defendants went to the baggage claim area where Clinkscale took a seat by the conveyor belt and waited for luggage while Humphrey stood apart from him by the door. When Clinkscale claimed a particular suitcase and left the area, Humphrey nervously looked around several times, then left the area, keeping approximately fifty to seventy-five feet away from Clinkscale. The two men rejoined each other on an exit ramp and proceeded together to the short-term parking lot where Clinkscale put the suitcase in the trunk of an automobile and drove off with Humphrey as his passenger.
 
 
 4
 The police officers observing this activity obtained the license number of the automobile in question and soon established that it was registered to Anthony Humphrey of Youngstown, Ohio. They also obtained information from the parking attendant to the effect that the parking fee had been $70.00 and that the automobile had been there for two days. Finally, they checked the flight's passenger manifest, which revealed that Fred Clinkscale and Anthony Sims had traveled first class on the flight.
 
 
 5
 With this information in hand, one of the airport officers telephoned Lt. Statler of the Boardman Police Department and relayed to him the observations made and information obtained by him and his partner at the airport. Lt. Statler already had information from a current investigation that the owner of the automobile, Anthony Humphrey of Youngstown, Ohio, had recently left on a drug buying trip to Florida, and he in turn telephoned Lt. Nichols, Boardman Police Department, to discuss stopping the automobile. He relayed a description of the automobile, including its license number, told Nichols about the current investigative information concerning the illegal purpose of Humphrey's Florida trip, and advised Nichols that airport police officers had just seen two people who fit their drug courier profile leave the airport in Humphrey's automobile. Apparently Statler did not relay the particular observations of the airport officers to Nichols. Thereafter, Lt. Nichols intercepted the defendants' automobile on the highway just outside Youngstown, Ohio.
 
 
 6
 Lt. Nichols arrested no one initially but did ask questions. In his conversations with Clinkscale and then with Humphrey, Nichols detected a series of probable lies. Clinkscale told Nichols that he and his passenger had just left a friend's house down the street and claimed that neither man had put anything in the trunk of the automobile. This prompted Nichols to ask for permission to inspect the trunk, and Clinkscale consented but stated that he had no trunk key. Nichols, who had observed the telltale rounded General Motors key on the key ring hanging from the automobile's ignition switch, obtained the key and again asked for consent to search the trunk. Clinkscale agreed to let him try the key, but as Nichols fitted it into the lock Clinkscale revoked the consent. Clinkscale was then asked about the ownership of the automobile, and he responded by saying that it belonged to his passenger. Clinkscale was placed in a police cruiser and a short time later was arrested at that location when Lt. Nichols learned that the Youngstown Police Department had an arrest warrant outstanding for Clinkscale on an unrelated charge.
 
 
 7
 Lt. Nichols then began an interview with Humphrey who, when asked his name, misidentified himself as Anthony Sims. He denied ownership of the automobile, but later admitted that his true name was Humphrey and that he owned the automobile.
 
 
 8
 Subsequent to these interviews and Clinkscale's arrest, Lt. Nichols opened the trunk of the automobile and searched the suitcase he found there. Inside he discovered four packages that proved to contain approximately four kilograms of cocaine, $16,700 in currency, and a loaded .380 caliber Bersa pistol. When Lt. Nichols discovered these items, he arrested Humphrey. A search of Clinkscale's person produced a receipt from a motel in Miami, Florida, and a baggage claim ticket showing the destination of Pittsburgh, Pennsylvania.
 
 
 9
 Both defendants filed pretrial motions to suppress the evidence taken from the automobile and their persons and argued that Lt. Nichols lacked probable cause to search them and the automobile. They also claimed that the police had purposely waited until the suitcase was placed in the vehicle in order that the automobile exception to the Fourth Amendment's warrant requirement could be used to justify the search. The district court held that Lt. Nichols had probable cause to stop the automobile and, as the events further developed, to search it. The district court also held that the police officers had not purposely tried to avail themselves of the automobile exception.
 
 
 10
 During the trial, counsel for defendant Clinkscale moved the court in limine to prevent the government from proving that Clinkscale had been arrested on the scene in answer to an outstanding but unrelated warrant of arrest. Some agreement on the matter was apparently reached between the court and counsel, but its exact nature is unclear from the record. Supp.J.A. 12. It may be that counsel for the government undertook not to mention the arrest warrant in exchange for some sort of instruction to protect against the jury's drawing any inferences about the legality or illegality of the search. Whether or not this was the intention of the parties and the court, counsel for the government, in his direct examination of Lt. Nichols, asked whether Clinkscale was arrested "on unrelated charges." Supp.J.A. 28. When defense counsel objected, the court did not strike the question but simply told the witness to answer yes or no. The witness answered no. Thereafter, defense counsel moved for a mistrial, which the court denied.
 
 
 11
 Both defendants were convicted on both charges. Each was sentenced to 108 months in prison on the drug count and given a consecutive 60-month sentence on the firearm count.
 
 
 12
 The issues on appeal are (1) whether Lt. Nichols had reasonable suspicion to stop the car and probable cause to remove the suitcase from the trunk and search it, (2) whether the court should have granted a mistrial because of the government's examination of Lt. Nichols concerning Clinkscale's arrest on unrelated charges, (3) whether there is sufficient evidence in the record to support each defendant's conviction for carrying a firearm under 18 U.S.C. Sec. 924(c), and (4) in defendant Clinkscale's case, whether he should have received a reduction in offense level of two to four levels because he was a "minimal" or "minor" participant within the meaning of U.S.S.G. Sec. 3B1.2.
 
 II.
 A.
 
 13
 This court uses two different standards on review of suppression questions. The district court's factual findings are accepted unless they are clearly erroneous, but its application of the law to the facts is reviewed de novo. United States v. Sangineto-Miranda, 859 F.2d 1501, 1512 (6th Cir.1988); see United States v. Rose, 889 F.2d 1490, 1494 (6th Cir.1989). The facts in the case are not in dispute.
 
 
 14
 Both defendants argue that Lt. Nichols' stop of the defendants' vehicle lacked the reasonable suspicion of criminal activity deemed necessary to justify such a stop under the holding of Terry v. Ohio, 392 U.S. 1, 30 (1968). Humphrey, in particular, points out that this court, in United States v. Smith, 574 F.2d 882, 884 (6th Cir.1978), held that "the characteristics of the drug courier profile are not alone enough to provide probable cause to arrest nor necessarily enough to create a reasonable suspicion to stop under Terry." (Emphasis added). Clinkscale argues that this court should adopt the two-prong test rejected by the Supreme Court in United States v. Sokolow, 490 U.S. 1, ----, 109 S.Ct. 1581, 1585 (1989), and by this court in Rose, 889 F.2d at 1496.
 
 
 15
 In Sokolow, the Court held that the validity of a Terry stop must be viewed in light of the totality of its circumstances. It also held that, while an officer making the stop must have more than a "hunch," the "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." 490 U.S. at ----, 109 S.Ct. at 1585. It specifically noted that, as it had said in Illinois v. Gates, 462 U.S. 213, 243-44 n. 13 (1983), innocent behavior might frequently provide the basis not only for a showing of reasonable suspicion sufficient to justify a Terry stop but for probable cause as well. Sokolow, 490 U.S. at ----, 109 S.Ct. at 1587.
 
 
 16
 Other than information necessary to identify the automobile and its occupants, Lt. Nichols had three pieces of information which justify a reasonable suspicion in this case. First, although he did not apparently have the details, he knew that airport police officers had watched the two men in question and concluded that they fit the drug courier profile. Second, Lt. Nichols knew from Lt. Statler that the police department had information about Anthony Humphrey to the effect that he had recently left Youngstown on a drug buying trip to Florida. Third, he knew the automobile he was seeking belonged to Anthony Humphrey. Those facts may not submerge the defendants in a river of guilt, but they do provide an articulable basis for a conclusion by Lt. Nichols that Humphrey was riding in the automobile registered to him and that he was just returning from the drug buying trip to Florida described in the police department's information files. This possibility was reinforced by the fact that airport police officers had independently concluded that the occupants of the vehicle were possible drug dealers because they matched certain aspects of the drug courier profile. Taken all together, this was more than sufficient information to justify Lt. Nichols' suspicion that criminal activity was afoot. His stop of the vehicle was, therefore, lawful.
 
 
 17
 Each defendant also challenges the search in this case, claiming that it was conducted without probable cause. The next question is whether Lt. Nichols' reasonable suspicion ripened into the requisite probable cause. Nichols obtained several pieces of crucial information between the time he stopped the automobile and the time he undertook his search. First, he talked by telephone to the airport police officers and learned the particulars of their observations. For example, he learned that both defendants had appeared to be highly nervous, that they virtually fled the airport, that they had arrived on the flight from Miami, a known drug source city, and that their stay there had been a short one because their car had been parked in short-term parking for only two days. He also learned that Clinkscale had been seen putting a suitcase in the trunk of the automobile.
 
 
 18
 Lt. Nichols was further armed with information, and the inferences flowing from it, that he received in conversations with the defendants. In his conversation with defendant Clinkscale, for example, Lt. Nichols learned that Clinkscale was repeatedly lying to him. First, Clinkscale lied about not having a key to the trunk. Lt. Nichols had seen a rounded key that he recognized as the probable trunk key dangling from a ring of keys below the ignition switch. With Clinkscale's consent, Nichols tried the key and it fit the lock before the consent was revoked. Nichols also knew Clinkscale had lied when he said he and Humphrey had just come from a friend's house and that he had put nothing in the trunk. It was reasonable for Nichols to conclude from this conversation that Clinkscale was defending the contents of the trunk by every lie necessary to do so and, therefore, the trunk probably contained the drugs Nichols suspected.
 
 
 19
 Lt. Nichols' probable cause ripened further during his conversation with defendant Humphrey. Humphrey lied when he said his name was Sims and lied again when he disclaimed ownership of the automobile. Nichols knew these were lies because Clinkscale had already told him that Humphrey was the owner of the automobile, and Nichols knew from information relayed to him that the registered owner of the automobile was Anthony Humphrey, not Anthony Sims. Thus, Humphrey was distancing himself from the automobile as much as he could, even to the point of disclaiming it.
 
 
 20
 Some of the strongest inferences in law are drawn from lies, and courts routinely instruct juries that they may draw the inference of consciousness of guilt from proof of suppression of evidence or the making of false exculpatory statements. Lt. Nichols was justified in drawing similar inferences from all of these lies, inferences that the trunk contained something that Clinkscale did not want to be connected with and that Humphrey would give up his name and his automobile in order to avoid being associated with. When added to the other evidence available from all sources, these conversations established probable cause to search in this case.
 
 
 21
 Both defendants also argue that, assuming the police had probable cause to search the suitcase before the automobile left the airport, they violated the defendants' constitutional rights "by waiting for such suitcase to be placed in an automobile, in order to rely on the automobile exception...." The district court rejected this argument and found that the police, rather than trying to create an artificial automobile exception to the warrant requirement, were gathering additional information to support probable cause before they actually searched. The facts of this case show that the court's conclusion is correct. All the airport police officers actually knew about the situation prior to the time defendants left the airport was that they were suspicious-looking first-class passengers on a flight from a source city who were disguising their association by remaining apart. The other information about the registration of the automobile, the police intelligence information about Humphrey's drug trips, and the two-day time period during which Humphrey's car had been parked in the short-term parking area, was developed after the luggage was placed in the vehicle.
 
 
 22
 The defendants' reliance on Arkansas v. Sanders, 442 U.S. 753 (1979), is misplaced. In that case, the Court held that police officers who had probable cause to search a vehicle without a warrant did not have the authority to search luggage found within it in the absence of a search warrant. In United States v. Ross, 456 U.S. 798 (1982), however, the Supreme Court extended the scope of the warrantless search of an automobile to all of its parts and all of its contents that might conceal the things being searched for. 456 U.S. at 825. In so doing the Court specifically rejected some of the reasoning in Sanders as inconsistent with its decision, although it was able to avoid actually overruling Sanders. Id. at 824. Ross effectively confined the scope of Sanders to its facts--that police cannot rely on the automobile exception to conduct a warrantless search of luggage which they had probable cause to search before it was placed in an automobile. The applicable rule of decision is supplied by Ross, not Sanders, and the facts of this case in no way indicate that police officers tried to engineer the search in such a way as to avoid the application of Sanders.
 
 B.
 
 23
 Both defendants challenge the sufficiency of the evidence and argue that the evidence in the record could not support their conviction on Count II, the alleged violation of 18 U.S.C. Sec. 924(c)(1). In reviewing questions of sufficiency of the evidence, the appellate court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); United States v. Johnson, 831 F.2d 124, 130 (6th Cir.1987), cert. denied, 485 U.S. 968 (1988).
 
 
 24
 This court has broadly construed the "use and carry" terms of section 924(c) and upheld convictions in which a defendant used or carried a firearm to protect his drugs, drug money, person or premises; used or carried a firearm to embolden or encourage himself to procure or market his drugs in the dangerous subculture of crime; or used or carried the firearm as part of his plan of escape. United States v. Brown, 915 F.2d 219, 224-26 (6th Cir.1990). The evidence shows that the firearm in question was found in the suitcase next to a large sum of cash and a huge quantity of cocaine. Its presence in the same container with the evidence of drug dealing permits inferences to be drawn that it was used or carried in connection with the articles it traveled with.
 
 
 25
 As to Humphrey, the proof also shows that he personally bought the gun and ammunition and, therefore, owned them. He also bought the airplane tickets the two men used on their trip, and he owned the automobile in which the two men and the gun had traveled to and from the airport. A rational jury could easily have concluded from this evidence that Humphrey used and carried his loaded gun during and in relation to his drug trafficking trip.
 
 
 26
 As to Clinkscale, the proof shows that he claimed the suitcase containing the gun and personally carried it to the parking lot where he placed it in the trunk of Humphrey's automobile. The "during and in relation to" elements of the statute are satisfied, as in Humphrey's case, because the presence of the gun in proximity to the cocaine generates the natural inference that it was intended for use as a part of the drug transaction. Since a person can exercise dominion and control jointly with another, it is also significant that it was Clinkscale in the driver's seat with possession of the key to the trunk. In United States v. Gibbs, 904 F.2d 52, 57 (D.C.Cir.1990), the court found that a defendant driving a rental car had constructive possession of a loaded rifle found in the trunk, in part because he held the keys. See also United States v. Posner, 868 F.2d 720, 723-24 (5th Cir.1989) (collecting "key" cases).
 
 
 27
 Clinkscale's final argument on this issue is that the government failed to prove that his carrying of the firearm was knowingly done. Usually, state of mind must be shown circumstantially. Some of the telling circumstances in this case were that Clinkscale obviously went on a drug-buying trip with Humphrey; that Humphrey's pistol was bought in Youngstown, Ohio, and presumably traveled to Miami and back with the two men as part of their plan to protect their drugs, money and persons; that it was apparently Clinkscale's part of the transaction to be in charge of the only suitcase the men had between them; and that Clinkscale made false exculpatory statements about the contents of the automobile's trunk and the origin of the particular trip interrupted by Lt. Nichols. When viewed in the light most favorable to the prosecution, these circumstances, and all of the others in the case, might well have persuaded a rational jury to conclude that Clinkscale knew of the presence of the firearm in the only suitcase which the two men had.
 
 C.
 
 28
 A district court's ruling on evidentiary matters will be reversed only upon a showing of an abuse of discretion. See United States v. Rios, 842 F.2d 868, 872 (6th Cir.1988) (per curiam), cert. denied, 488 U.S. 1031 (1989).
 
 
 29
 Clinkscale's motion in limine to exclude evidence of an outstanding arrest warrant against him was followed by an apparent agreement among the parties and the court to deal with the situation in a particular way, although the details of the agreement are unclear from the record. In any event, the following occurred during the prosecutor's direct examination of Lt. Nichols:
 
 
 30
 Q. Now, did there come a time when Fred Clinkscale was actually placed under arrest?
 
 
 31
 A. There did.
 
 
 32
 Q. And was that unrelated charges?
 
 
 33
 A. Could you repeat that?
 
 
 34
 MR. AMENDOLARA: Objection, your honor.
 
 
 35
 Q. Was that based on unrelated charges?
 
 
 36
 THE COURT: Just yes or no.
 
 
 37
 A. No--related charges to this stop?
 
 
 38
 Q. Right.
 
 
 39
 A. No.
 
 
 40
 Supp.J.A. 28.
 
 
 41
 Two things are notable about this testimony. First, if there were an agreement by the United States attorney not to mention the fact that Clinkscale had been arrested on unrelated charges, then the court either ignored that agreement or had some other understanding of it because the court instructed the witness to answer yes or no rather than sustaining the objection. The second notable feature is that the witness answered in the negative, thus testifying that Clinkscale was not arrested on unrelated charges.
 
 
 42
 Defendants later moved for a mistrial and the court, in denying that motion, stated: "[T]he way the question was asked and answered, particularly when it was first asked and answered, was not a definitive matter. I don't think it justifies the mistrial." J.A. 45. Evidently the witness misunderstood the question and answered it incorrectly, but the net effect is that no evidence of an unrelated charge against Clinkscale was testified to in the jury's presence. Therefore, no prejudice can be claimed by defendant Clinkscale.
 
 D.
 
 43
 Defendant Clinkscale argues that he should have received a two-to-four level reduction in the computation of his offense level because, under United States Sentencing Guidlines Sec. 3B1.2, he was a "minimal" or "minor" participant in these offenses. Under the pertinent statute, 18 U.S.C. Sec. 3742, and under our decisions, United States v. Perry, 908 F.2d 56, 58 (6th Cir.), cert. denied, 111 S.Ct. 565 (1990); United States v. Anders, 899 F.2d 570, 580 (6th Cir.), cert. denied, 111 S.Ct. 532 (1990), review of a district court's judgment on this particular issue is only to determine whether or not it was clearly erroneous. Clinkscale argues that the commentary to section 3B1.2 mentions that a person recruited as a courier for "a single smuggling transaction involving a small amount of drugs" might be considered for a decrease in the offense level under this section. Unfortunately for him, we do not view four kilograms of cocaine as representing a "small amount."
 
 
 44
 Clinkscale also argues that the evidence suggests that Humphrey outranked him in this enterprise because Humphrey owned the car, owned the gun, and apparently had better jewelry. Assuming this all to be true, a relatively lower ranking in a criminal enterprise does not automatically, or even usually, entitle a defendant to a reduction in his offense level under section 3B1.2 because in every criminal organization some defendants will always be less powerful and less culpable than others. Section 3B1.2 is reserved for those on the very bottom rungs of power and culpability, and the evidence in this case does not show that Clinkscale operated in that menial role. Under the facts and circumstances of this case, the district court's determination is not clearly erroneous.
 
 E.
 
 45
 In his statement of the issues, Clinkscale has alleged that the district court again abused its discretion in failing to award him a two-level reduction under U.S.S.G. Sec. 3E1.1, the section which rewards a defendant's acceptance of responsibility for his criminal conduct. In his brief, however, Clinkscale does not mention or argue this issue. He has, therefore, abandoned it. See McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986).
 
 III.
 
 46
 For the foregoing reasons, the judgments of the district court in these consolidated cases are AFFIRMED in all respects.
 
 
 
 *
 Honorable Robert E. DeMascio, Senior United States District Judge for the Eastern District of Michigan, sitting by designation