**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Betty J. JOHNSON (86–1993), James E. Johnson, (86–1994), Andrew Paul Taylor (86–2013), Defendants-Appellants.**

Nos. 86–1993, 86–1994 and 86–2013.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 24, 1987.

Decided Oct. 15, 1987.

Rehearing and Rehearing En Banc Denied in No. 86–2013 Dec. 7, 1987.

Howard J. Wittenberg (Court-appointed), argued, Detroit, Mich., for Betty J. Johnson.

Alvin Keel (argued), Bloomfield Hills, Mich., for James E. Johnson.

Frank D. Eaman (Court-appointed), argued, Detroit, Mich., for Andrew Paul Taylor.

Michael Lang (argued) Asst. U.S. Atty., Detroit, Mich., for U.S.

Before JONES, WELLFORD and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Defendants, Andrew Paul Taylor, James E. Johnson, D.O., and Betty J. Johnson, appeal from their jury convictions for drug-related offenses. All three defendants were convicted on one count each of conspiracy to distribute controlled substances

in violation of 21 U.S.C. § 846.[1] Taylor was convicted on ten counts of distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1),[2] and on two additional counts of aiding and abetting. *See* 18 U.S.C. § 2.[3] Dr. Johnson was also found guilty on three counts of violating section 841(a)(1). The district court, however, having previously reserved judgment on defendants' motion to dismiss, dismissed one of the section 841 counts against both Taylor and Dr. Johnson.

Betty Johnson received a five-year sentence on the conspiracy conviction which was subsequently reduced to three years. Dr. Johnson was also sentenced to five years on the conspiracy charge and fifteen years on each of the two distribution charges, all three of the sentences to run concurrently. Andrew Taylor received two concurrent fifteen-year sentences for aiding and abetting and an additional fifteen-year sentence on the nine counts of distribution to be served consecutively to the sentence imposed for aiding and abetting. Taylor was also sentenced to serve five years for conspiracy concurrent to the time served on his other sentences.

For the following reasons, the convictions and sentences are affirmed.

## I.

The defendants' convictions resulted from their involvement in a medical center where prescriptions for controlled substances were illegally dispensed for non-medical purposes. In August of 1981, Andrew Taylor incorporated the Woodward-Peterboro Medical Center. The clinic opened in March of 1982 in Detroit, Michigan. For the most part, the clinic conducted its business activities during the evening hours from 6:30 p.m. to 8:00 p.m. three nights a week. Taylor, who is not a li-

censed doctor, supervised virtually all the administrative affairs of the clinic. Patients were charged $20 per visit which entitled them to an examination and one prescription (usually of their choice). Additional prescriptions could be obtained for $10 apiece.

The first doctor at the clinic was Dr. Gotham who worked evenings there through the summer of 1982. One of the doctors who subsequently worked there, Dr. Candida Misra, testified that she quit after only a few hours because she objected to the manner in which controlled substances were prescribed to the patients. Another doctor who worked at the clinic in the fall of 1982, Dr. Lonie Ocdol, also quit after only three nights because she refused to prescribe the type of drugs the patients demanded. Defendant, Dr. James Johnson, was hired after Dr. Ocdol left the clinic. From September 29, 1982, to January 5, 1983, Dr. Johnson worked two or three nights a week at the clinic for which he received $500 per week in cash.

The government charged that during Dr. Johnson's tenure at the clinic, he often prescribed Schedule II controlled substances for no legitimate medical purpose. After a perfunctory examination, patients would complain of discomfort and request powerful pain killers or they would express a desire to lose weight in order to obtain amphetamines. Often, the patient would suggest a specific medication such as Percodan, Demerol or Desoxyn. The doctor would fill out the prescription and the patient could pick it up from the receptionist after paying the bill. As many as 40 to 60 patients would crowd into the waiting room on any given night the clinic was open. One of the patients testified that he saw Dr. Johnson signing blank prescriptions after the clinic closed for the evening. The

---

**1.** Title 21 U.S.C. § 846 provides in part, "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both...."

**2.** Title 21 U.S.C. § 841(a)(1) provides:
Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; ....

**3.** Title 18 U.S.C. § 2(a) provides, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

clinic continued to issue prescriptions purportedly signed by Dr. Johnson long after he left the clinic in January of 1983.

Later in the clinic's operation, the procedures became even less rigorous and patients would simply pay for a prescription without having to undergo the formality of an examination. Taylor also sold prescriptions outside of the clinic. During a six-month period in 1983, Taylor sold approximately fifty signed prescriptions a week to Betty Johnson who in turn sold them to Loretta Davenport and her sister Wilma Young. The prescriptions were then filled at area pharmacies and the pills were eventually sold on the street. A survey of twenty Detroit area pharmacies revealed that at least 9,599 prescriptions for Schedule II controlled substances had been issued by the clinic during the three years in which it operated. Eventually, several area pharmacies refused to honor the prescriptions issued by the clinic and it finally closed in April of 1985. Defendants raise several issues on appeal and we address each separately.

## II.

■ Defendant Taylor was convicted on nine separate counts of "knowingly, intelligently, and unlawfully distribut[ing] a Schedule II Narcotic Drug Controlled Substance ... by issuing a prescription ... for the drug outside the usual course of medical practice and for no legitimate medical purpose in violation of Title 21, United States Code, Section 841(a)(1)." Taylor was also convicted on two similarly phrased charges of aiding and abetting Dr. Johnson. On appeal, Taylor contends that

he cannot be lawfully convicted of distributing controlled substances "by the issuance of prescriptions outside the usual course of medical practice" because such an offense can only be committed by licensed physicians who have improperly issued prescriptions. We reject this argument.

Section 841(a)(1) provides:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance.

21 U.S.C. § 841(a)(1). Thus, the basic proscription in section 841 applies to "any person" except those "authorized by this subchapter" such as physicians registered with the Attorney General pursuant to 21 U.S.C. § 822. In *United States v. Moore,* 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), the Supreme Court limited the scope of this exception by holding that a physician who abuses the privilege by issuing prescriptions outside the usual course of professional practice is subject to punishment under section 841(a)(1) just as any other "drug pusher." *Id.* 423 U.S. at 139–45, 96 S.Ct. at 343–47.[4]

In a somewhat convoluted argument, Taylor seizes on the descriptive phrase "by issuing a prescription ... for the drug outside the usual course of medical practice and for no legitimate medical purpose" which appears in the indictment, and concludes that he was charged with "dispensing"[5] a controlled substance as opposed to

---

**4.** The Supreme Court's holding in *Moore* has since been promulgated into a regulation which provides in part:

A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.... An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be

subject to the penalties provided for violations of provisions of law relating to the controlled substances.

21 C.F.R. § 1306.04(a).

**5.** Title 21 U.S.C. § 802(10) provides:

The term "dispense" means to deliver a controlled substance to an ultimate user or a research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling, or compounding necessary to prepare the substance for such delivery. The term "dispenser" means a practitioner who so delivers a

"distributing"[6] or "delivering."[7]  In a further leap of logic Taylor argues that the act of "dispensing" can only be committed by a licensed physician and since he is not a licensed practitioner, he cannot be lawfully convicted under section 841 for issuing bogus prescriptions.  We are not persuaded by this argument.

Essentially, Taylor is contending that he does not fit within the category of physicians which, under *Moore*, were excluded from the exception for practitioners registered under section 822.  Proceeding from this assumption, Taylor then reaches the dubious conclusion that he is not subject to the general rule.  The weakness of this argument is apparent.  Obviously, the Supreme Court's pronouncements in *Moore* are not directly applicable to Taylor since he was never a licensed practitioner, and therefore, never eligible for the exception contained in the first sentence of section 841.  Thus, Taylor falls within the general rule which applies to "any person."  Moreover, Taylor fails to note that the indictment specifically charges him with "distributing" and not "dispensing."  Thus, even assuming *arguendo* there is a meaningful difference between "distribute" and "dispense" and that dispensing only applies to licensed practitioners,[8] Taylor was properly charged.

As noted by the Third Circuit in *United States v. Tighe*, 551 F.2d 18 (3rd Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977), a prescription for a controlled substance "cannot be regarded as less than the constructive or attempted transfer of the substance itself, since a prescription is the written representation of the drug and enables its possessor to claim physical custody and control over the drug prescribed."  551 F.2d at 20.  Therefore, we hold that the sale by a nonpractitioner of bogus prescriptions which are in fact used to obtain controlled substances is tantamount to the distribution of the substances themselves and hence, is properly punishable as unlawful distribution of drugs in violation of section 841(a)(1).[9]  We need not speculate on what conduct short of this by a nonpractitioner might also constitute a violation.

Taylor also contends that there is insufficient evidence to support his convictions on two counts of aiding and abetting Dr. Johnson.  We disagree.  The record reveals that Taylor was intimately involved in virtually every facet of administrating the clinic, including the hiring and firing of the doctors and the staff, the recording of the receipts and the prescriptions, and the

---

controlled substance to an ultimate user or a research subject.

6.  Title 21 U.S.C. § 802(11) states, "The term 'distribute' means to deliver (other than by administering or dispensing) a controlled substance.  The term 'distributor' means a person who so delivers a controlled substance."

7.  Title 21 U.S.C. § 802(8) provides, "The terms 'deliver' or 'delivery' mean the actual, constructive, or attempted transfer of a controlled substance, whether or not there exists an agency relationship."

8.  For an exhaustive review of appellate cases discussing this issue, see *United States v. Genser*, 710 F.2d 1426, 1430 (10th Cir.1983).  In *Genser*, the Tenth Circuit concluded that "dispensing" is the delivery of a controlled substance by a "practitioner" whereas "distributing" is simply the delivery of a controlled substance.  Nevertheless, the court held that they constituted the same offense for double jeopardy purposes, and hence, a nonpractitioner who is mistakenly charged with "dispensing" in his first case could

not be retried on the same facts for "distributing."  *Id.* at 1431.

We express no opinion as to whether a nonpractitioner can be properly charged with "dispensing" controlled substances in violation of section 841(a)(1).  We note, that this court has previously upheld the conviction of a doctor who was charged with "distribution" rather than "dispensing" finding that the defendant's attempt to draw a distinction between the two was "merely a play on words."  *United States v. Ellzey*, 527 F.2d 1306, 1308 (6th Cir.1976).

9.  We note that this court has recently upheld a conviction under sections 841(a)(1) and 846 for conspiracy to distribute controlled substances where the defendant had set up an illegitimate store front clinic through which he and others sold forged prescriptions.  *See United States v. Flowers*, 818 F.2d 464 (6th Cir.1987).  Relying in part on the Third Circuit's holding in *Tighe*, we stated, "Thus, we conclude that Congress intended that a person could violate section 841(a)(1) without actually distributing the controlled substances, but only by writing a prescription for their distribution."  At 467.

supervision of the employees who actually handed out the prescriptions and received the payments. We find Taylor's close supervision of the clinic sufficient to support the conclusion that he aided and abetted Dr. Johnson in the issuance of illegal prescriptions.

■ Taylor also requests that we set aside his sentence as being excessive in light of his age (44 years) and his lack of a criminal record. First, we note that contrary to Taylor's contention, he did not receive the maximum sentence possible which would have totalled well over 100 years if all his sentences were made to run consecutively. Instead, the court imposed two consecutive fifteen year sentences and a concurrent sentence of five years for a maximum total of thirty years imprisonment. As a general rule, a sentencing decision by a district judge is unreviewable if it is within the statutory limits. *See United States v. Barbara*, 683 F.2d 164 (6th Cir.1982). Taylor has failed to demonstrate the type of gross abuse of discretion on the part of the sentencing judge which would necessitate a reversal of the sentencing order.

■ Defendant Taylor also claims that the district court erred in failing to strike prejudicial comments made by some of the government's witnesses. Two of the witnesses mentioned that their husbands died of drug overdoses. Another witness testified that she had stopped buying drugs from Dr. Crawford, who had formerly worked at the clinic, because he "had gone to jail." With regard to the references to fatal drug overdoses, we note that these statements were made without objection. In fact, on cross-examination defense counsel revisited the issue in an attempt to show that the witnesses were biased against the clinic. We find that the district court's failure to strike these statements does not amount to the type of "plain error" which would require a reversal despite the absence of an objection at trial. *See* Fed.R.Crim.P. 52(b). With respect to the reference to Dr. Crawford's imprisonment, this comment was promptly objected to on the basis that the witness did not have specific knowledge of the event. The objection was sustained and when the prosecutor asked whether the witness had such knowledge, the trial judge interrupted the examination *sua sponte* and excused the jury. The judge then admonished the prosecutor for pursuing this line of questioning and when the jury was called back, the court instructed them to disregard the testimony about Dr. Crawford. Under these circumstances, we are unable to find any improper behavior on the part of the court which would support Taylor's claim of prejudicial error.

### III.

■ Dr. Johnson essentially raises three issues on appeal. First, Dr. Johnson claims that the district court abused its discretion by admitting two written prescriptions into evidence. He contends that these prescriptions constituted impermissible hearsay evidence and that their admission violated his sixth amendment right to confrontation because the patient whose name appears on the prescription was not called as a witness. With respect to the alleged hearsay problem, we note that, prior to trial, defendant stipulated to the fact that these prescriptions were issued by the clinic and filled by the pharmacies. Thus, any *hearsay* objection could have been answered by admitting the prescriptions under the business records exception to the hearsay rule. *See* Fed.R.Evid. 803(6). There is absolutely no basis for the alleged violation of Dr. Johnson's sixth amendment right to confrontation since the absent witness *was not the author of the prescriptions*. Finally, we note that Dr. Johnson was acquitted on one of the counts based on one of these prescriptions and the trial court subsequently dismissed the guilty verdict on the other count. Thus, since Dr. Johnson does not now stand convicted of any of the charges that were based directly on these two prescriptions, we find that whatever prejudice which he may have incurred, if any, can only be characterized as "harmless error." *See* Fed.R.Crim.P. 52(a).

■ In his second argument, Dr. Johnson asserts that the trial judge abused his

discretion by refusing to accept a jury instruction which would have required the jury to consider whether Dr. Johnson's actions comported with the recommended range of treatments contained in the *Physician's Desk Reference* (PDR), a commonly used diagnostic guide. We note that defense counsel did object to the court's refusal to include this jury instruction; however, the PDR had not been admitted into evidence or authenticated as a learned treatise. Moreover, two of the experts called by the government testified that the PDR was recognized as a reference but was not considered authoritative, although the defendant's expert claimed that the PDR was an authority. On appeal, counsel for Dr. Johnson contends that the trial judge prohibited him from reading portions of the PDR into evidence. In response, the government disputes this assertion and quotes from a post-judgment order in which the district court denies making such a ruling. We also note that there is nothing in the record which would indicate that defense counsel was prevented from referring to the PDR during trial. On the contrary, there are several instances where the record shows that counsel referred to and quoted from the PDR without objection during the examinations and cross-examinations of the expert witnesses. In sum, we find no abuse of discretion on the part of the trial judge in this regard.

Finally, Dr. Johnson claims that there was insufficient evidence presented to support his conspiracy conviction. When reviewing a verdict for sufficiency of evidence, the appellate court must determine "[w]hether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bourjaily*, 781 F.2d 539, 544 (6th Cir.1986) (emphasis in original), *aff'd,* — U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). "This Court has long recognized that purely circumstantial evidence may be sufficient to sustain a conspiracy conviction." *United States v. Green*, 548 F.2d 1261, 1266 (6th Cir.1977). We find an abundance of circumstantial evidence in the record upon which the jury could rely to support its conclusion that Dr. Johnson knowingly and intentionally entered into a conspiracy to illegally distribute controlled substances. Dr. Johnson argues that the prosecution failed to present sufficient evidence to prove that he engaged in an "overt act" in furtherance of the conspiracy. This court has previously held, however, that "[i]t is not necessary to charge and prove an overt act in a prosecution under 21 U.S.C. § 846." *United States v. Dempsey*, 733 F.2d 392, 396 (6th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984).

## IV.

Betty Johnson also contends on appeal that there was insufficient evidence to support her conviction for conspiracy to distribute controlled substances. This argument is without merit. The government presented two witnesses at trial, Wilma Young and Loretta Davenport, who testified that Betty Johnson supplied them with false prescriptions obtained from the clinic. Young and Davenport stated that Johnson delivered as many as fifty prescriptions a week for a period of six months. The prescriptions were filled by Young and Davenport and by their relatives who in turn sold the pills on the street. Another witness testified that he saw Ms. Johnson deliver prescriptions to his aunt. Finally, the record indicates that Betty Johnson admitted her involvement in the illegal activities when questioned by two federal agents. Thus, there was ample evidence presented from which the jury could have concluded beyond a reasonable doubt that Ms. Johnson was guilty of conspiracy.

For the foregoing reasons, the convictions and sentences of all three defendants, Andrew Paul Taylor, Dr. James Johnson, and Betty Johnson, are AFFIRMED.