991 F.2d 797
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Junior T. JOHNSON, Defendant-Appellant.
 No. 92-1839.
 United States Court of Appeals, Sixth Circuit.
 April 9, 1993.
 
 Before KENNEDY and MILBURN, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Junior Tivis Johnson appeals his jury conviction and sentence for one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1) and three counts of the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1). On appeal, the issues are (1) whether sufficient evidence was presented at trial to support defendant's convictions; (2) whether defendant's prosecution and conviction were barred by the doctrine of double jeopardy; (3) whether the district court erred in denying defendant's motion to suppress evidence; and (4) whether the district court erred in calculating defendant's sentence under the sentencing guidelines. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 At the time of the charged offenses, defendant Johnson was a 52 year-old individual with a fifth-grade education. Following an automobile accident, defendant required pain and anti-seizure medications, including Percodan, and he developed a physical dependence on drugs that had been prescribed for him. This case arose from defendant's attempt to obtain Percodan, a pain medication available only by prescription. Defendant was acquainted with Aulenthia Raheem (a/k/a Rosa Pressley), who supplied him with the names of individuals who desired medications which only a physician could prescribe. Defendant was also acquainted with Dr. Thomas Flake, a physician who had previously treated him. Dr. Flake wrote prescriptions in the patient names provided by Raheem without ever seeing or examining the individuals. Defendant delivered names supplied by Raheem to Dr. Flake, who would write prescriptions and give them to defendant to return to Raheem.
 
 
 3
 On the morning of April 13, 1988, undercover FBI Agent David Wilson was introduced to Raheem by a confidential informant named Sherry Walton. Raheem told Wilson that she could obtain "verifiable" prescriptions written by Dr. Flake from a "white guy" known as "Andy," and "Andy" was subsequently identified as the defendant. Because the prescriptions would be "verified" by Dr. Flake if a pharmacist telephoned to determine the validity of the prescriptions, they were considered more valuable than ordinary bogus prescriptions.
 
 
 4
 The undercover agent agreed to meet with Raheem at the parking lot of a party store located a few blocks from Dr. Flake's office. This meeting occurred later in the morning of April 13, 1988, at the party store parking lot. The confidential informant took the cash and the agent's list of "patient" names over to Raheem's car. Thereafter, defendant drove into the parking lot and met with Raheem and the confidential informant. After the lists of names and cash were provided to defendant, the confidential informant and agent Wilson left the parking lot. Surveillance officers did not follow defendant. However, prescriptions written by Dr. Flake, and bearing the exact five fake "patient" names provided by Agent Wilson, were subsequently given to the confidential informant, who then gave them to FBI Agent Barenie, another agent working on the case.
 
 
 5
 A similar transaction occurred on April 15, 1988. The confidential informant and Agent Wilson met Raheem in the same party store parking lot, and the confidential informant provided a list of five fake "patient" names to defendant. On this occasion, defendant raised the price from $20 per prescription to $25 per prescription. No surveillance officers were present. Subsequently, however, the FBI received prescriptions written by Dr. Flake and bearing the fake "patient" names provided to defendant.
 
 
 6
 A third purchase of "verifiable prescriptions" took place on May 2, 1988. Once again, defendant received a list of five fake "patient" names and $125 in cash from the confidential informant in the party store parking lot. This time surveillance officers followed defendant to Dr. Flake's office. After defendant left Dr. Flake's office, he returned to the party store parking lot and met Raheem. Five "verifiable" prescriptions for Percodan written by Dr. Flake were provided to the confidential informant who gave them to FBI Agent Barenie.
 
 
 7
 A fourth transaction was begun on May 9, 1988. During a meeting at the party store parking lot, the undercover agent provided Raheem and defendant with a list of 40 "patient" names and $1,000 in cash. The cash had been photocopied so that it could be identified by serial number if any of it were later recovered. On this occasion, the FBI planned to follow defendant and Raheem until the prescriptions had been obtained and then arrest them.
 
 
 8
 After defendant was given the cash and "patient" names, he was followed to Dr. Flake's office. Defendant entered the office at about 11:07 a.m. and left at around 12:38 p.m. He then returned to the party store parking lot and met with Raheem. The surveillance officer observed defendant carry some papers to Raheem's car which he left with her.
 
 
 9
 Believing that defendant had delivered the prescriptions and patient lists to Raheem, the FBI followed her, pulled her vehicle over, and arrested her. A search of her purse revealed the prescriptions written by Dr. Flake which the undercover agent had ordered. Raheem also had the list of patient names, $400 from the $1,000 in "buy" money, and empty prescription bottles in her possession at the time of her arrest.
 
 
 10
 At approximately the same time, the FBI executed the federal search warrant which it had previously obtained for Dr. Flake's office. The agents seized numerous verification lists from Dr. Flake's office, including six lists from his jacket pocket bearing 30 of the 40 fake "patient" names that had been given to Raheem and defendant by the undercover agent. Dr. Flake also had verification lists corresponding to the fake "patient" names submitted by the undercover agent for the previous "buys," and he did not have any legitimate patient records for the fake "patient" names submitted by the undercover agent. Dr. Flake also had $400 from the $1,000 in "buy" money.
 
 
 11
 After his meeting with Raheem, defendant was followed to a pharmacy and was arrested when he left the pharmacy. Upon being advised of his Miranda rights, defendant initially denied procuring or distributing prescriptions. Subsequently, however, he admitted that he obtained prescriptions from Dr. Flake but claimed that since he was selling them for the price Dr. Flake charged him, he was not breaking any law. A search of the defendant's person revealed one $50 bill of the "buy" money. Defendant's billfold, seized from his person, contained his Social Security card, Dr. Flake's business card, and verification lists.
 
 
 12
 A search of the car in which defendant was a passenger revealed two notepads containing additional verification lists and other prescriptions written by Dr. Flake. The erification lists included names matching the names on the business card in defendant's billfold. The verification lists also included the fake "patient" names provided by the undercover agent on May 2 and May 9, 1988. Defendant's wife, Linda Johnson, was in the car as defendant approached it from the pharmacy. A search of her purse revealed the $100 in "buy" money and blank Dr. Flake prescription forms.
 
 
 13
 An excerpt of defendant's testimony in a prior cocaine trial, held on June 20, 1988, was read to the jury in this case. The parties stipulated to the portions of the transcript from the prior trial which were relevant to the trial in this case. In his prior testimony, defendant admitted giving the lists of names to Dr. Flake and obtaining prescriptions, which he sold to other people. The defendant stated that he only charged what the doctor charged him. Defendant admitted selling prescriptions for Percodan from Dr. Flake starting about "four weeks ago." Defendant stated that he did this in order to get "free drugs" from Dr. Flake.
 
 B.
 
 14
 Defendant Johnson was charged by indictment with one count of conspiracy to distribute the Schedule II prescription drug Oxycodone (Percodan) in violation of 21 U.S.C. §§ 846 and 841(a)(1) and with three counts of distribution of the Schedule II prescription drug Oxycodone (Percodan) in violation of 21 U.S.C. § 841(a)(1).
 
 
 15
 Prior to trial in this case, defendant entered into a Rule 11 plea agreement with the government pursuant to Federal Rule of Criminal Procedure 11. The plea agreement provided that defendant's sentence would be concurrent to the federal sentence imposed in 1988, and that at sentencing, he would be entitled to a downward departure for acceptance of responsibility. Defendant pled guilty on December 13, 1990. However, at sentencing on April 19, 1991, the district court refused to accept the plea agreement and the case was set for trial.
 
 
 16
 On February 7, 1991, defendant filed a motion to dismiss the indictment on the ground of double jeopardy, but the motion was denied by the district court. Defendant also filed a motion to suppress evidence obtained from the warrantless search of the car in which he had been a passenger. Following a hearing, the district court denied the motion to suppress.
 
 
 17
 A jury trial was commenced on December 10, 1991, and defendant was convicted of all four of the counts in the indictment. At sentencing on June 24, 1992, defendant was sentenced to 121 months' imprisonment on each count, with the sentences to run concurrently, and three years of supervised release. The district court further ordered that defendant's sentence run consecutively to the sentence from his previous federal conviction. This timely appeal followed.
 
 II.
 A.
 
 18
 Defendant Johnson argues that insufficient evidence was presented by the government to sustain his convictions because, as a matter of law, the government failed to prove that he ever possessed the Percodan which he allegedly sought to distribute. Citing United States v. Vergara, 687 F.2d 57, 61 (5th Cir.1982), defendant asserts that under 21 U.S.C. § 841(a)(1), a conviction of possession with intent to distribute a controlled substance, such as Percodan, requires proof of three elements: (1) knowing, (2) possession of the controlled substance itself, and (3) intent to distribute. However, defendant was not convicted of possession of Percodan with intent to distribute. Rather, he was convicted of distribution of Percodan.
 
 
 19
 In United States v. Flowers, 818 F.2d 464 (6th Cir.), cert. denied, 481 U.S. 1056 (1987), this court upheld a conviction for conspiracy to distribute and attempt to distribute controlled substances by false prescriptions in violation of 21 U.S.C. §§ 841(a)(1) and 846. The defendant in Flowers sold forged prescriptions which were either sold or used by members of the conspiracy to purchase controlled substances which, in turn, were sold. Id. at 466. We stated that the writing of the forged prescriptions completed all of the elements of the offense prohibited by section 841(a)(1). We concluded that "a person could violate section 841(a)(1) without actually distributing the controlled substances, but only by writing a prescription for their distribution." Id. at 467. We further stated that
 
 
 20
 a prescription for a controlled substance "cannot be regarded as less than the constructive or attempted transfer of the substance itself, since a prescription is the written representation of the drug and enables its possessor to claim physical custody and control over the drug prescribed."
 
 
 21
 Id. at 467 (citing United States v. Tighe, 551 F.2d 18, 20 (3d Cir.), cert. denied, 434 U.S. 823 (1977)).
 
 
 22
 Similarly, in United States v. Johnson, 831 F.2d 124 (6th Cir.1987), cert. denied, 485 U.S. 968 (1988), this court upheld the defendants' convictions for conspiracy to distribute controlled substances and distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846. Defendants' convictions resulted from their involvement in a medical center where prescriptions for controlled substances were illegally dispensed for nonmedical purposes. Id. at 126. In Johnson, we held that "the sale by a nonpractitioner of bogus prescriptions which are in fact used to obtain controlled substances is tantamount to the distribution of the substances themselves and hence, is properly punishable as unlawful distribution of drugs in violation of section 841(a)(1)." Id. at 128.
 
 
 23
 In this case, defendant is arguing that because the prescriptions were never filled by a pharmacist, he cannot be convicted of distribution. However, defendant was selling "verifiable" prescriptions, and the only reason that the prescriptions were never filled was because the ultimate purchaser of the prescriptions was an FBI Agent.
 
 
 24
 The cases relied upon by defendant are clearly distinguishable. Defendant also cites United States v. Leigh, 487 F.2d 206 (5th Cir.1973), for the proposition that he cannot be convicted of distribution of Percodan. In Leigh, the Fifth Circuit held that a physician who, in the usual course of his practice, issued a prescription for a controlled substance without a legitimate medical purpose could be convicted of dispensing but not distribution of the controlled substance. Id. at 208. However, defendant is not a physician.
 
 
 25
 In United States v. Walker, 972 F.2d 679 (6th Cir.1992), also relied upon by defendant, this court held that possession of a prescription for a controlled substance is not the equivalent of possession of the controlled substance for purposes of 21 U.S.C. § 843(a)(3). However, defendant was neither prosecuted nor convicted under 21 U.S.C. § 843(a)(3). Thus, defendant's argument that, as a matter of law, insufficient evidence supported his conviction for distribution of Percodan is meritless.
 
 
 26
 Defendant also argues that the evidence was insufficient to link him to the specific transactions which occurred on April 13 and April 25, 1988. In reviewing the sufficiency of the evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard applies whether the evidence presented is direct or circumstantial. Holland v. United States, 348 U.S. 121, 140 (1954). Furthermore, "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.), cert. denied, 476 U.S. 1123 (1986).
 
 
 27
 In this case, defendant met with Raheem and the confidential informant in the party store parking lot on both April 13 and April 25, 1988. Defendant took the list of names and cash on both occasions and left the parking lot. Subsequently, he returned to the lot and gave Raheem the prescriptions written by Dr. Flake in the exact names as on the list. These prescriptions were turned over to the FBI. Further, although no surveillance of defendant was undertaken on April 13 and 25, there was surveillance on May 2 and May 9, 1988, which established a pattern from which the jury could conclude that defendant was a participant in the transactions and not a bystander.
 
 
 28
 Moreover, following the execution of the search warrant on May 9, 1988, verification lists were found in Flake's office and in the car in which defendant Johnson was riding. Some of the names on these verification lists matched the names on the lists prepared by the FBI and given by the confidential informant to Raheem and ultimately to defendant. Finally, when defendant, Raheem, and Dr. Flake were arrested on May 9, 1988, each of them had part of the $1,000 in "buy" money in their possession. From this evidence, the jury could infer that defendant was a participant in the transactions and that he had conspired with Dr. Flake and Raheem to sell the prescriptions for Percodan. Therefore, sufficient evidence exists to support defendant's convictions.
 
 B.
 
 29
 Defendant Johnson also argues that the district court erred in failing to dismiss the indictment against him on the ground of double jeopardy. Specifically, he asserts that during his 1988 trial for distribution of cocaine, the government used as substantive evidence of his guilt his admissions that he sold prescriptions for Percocet, which allegedly formed the basis for the indictment in this case. At his trial in 1988, defendant was convicted of conspiracy to distribute cocaine, based upon the delivery of cocaine to defendant which occurred in 1986. However, during defendant's 1988 trial, the government was permitted to offer proof that defendant sold prescriptions of Percocet in 1988, as probative of his willful entry into the 1986 cocaine conspiracy. At the 1988 trial, defendant took the witness stand on his own behalf and testified on cross-examination about obtaining prescriptions for Percocet from Dr. Flake. Defendant admitted that he obtained the prescriptions; however, he asserted that he did not sell them for profit but because he wanted to obtain prescription drugs for himself. During the trial in this case, defendant's testimony from his 1988 trial, concerning obtaining prescriptions for Percocet from Dr. Flake, was read to the jury on the grounds that it was an admission of a party opponent under Fed.R.Evid. 801(d)(2).
 
 
 30
 Relying on Grady v. Corbin, 495 U.S. 508 (1990), defendant asserts that because he was charged and convicted in this case for the same conduct to which he testified in the 1988 trial, the indictment in this case violates the prohibition against double jeopardy. In Grady, the Court held that the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government proves conduct that constitutes an offense for which the defendant has already been prosecuted. Id. at 509. However, the Court in Grady carefully distinguished the exact situation involved in the 1988 case, the use of similar acts evidence under Fed.R.Evid. 404(b). Id. at 521-22. There the Court stated, "the presentation of specific evidence in one trial does not forever prevent the government from introducing that same evidence in a subsequent proceeding." Id. (citing Dowling v. United States, 493 U.S. 342 (1990)). Furthermore, in United States v. Felix, 112 S.Ct. 1377 (1992), the Court held that the introduction of relevant Rule 404(b) evidence in one prosecution, followed by a subsequent prosecution for the Rule 404(b) conduct, does not violate the Double Jeopardy clause.
 
 
 31
 In 1988, the government used defendant's testimony about the Percocet prescriptions as "similar acts" evidence under Rule 404(b) to attack his credibility during the trial for his 1986 cocaine offenses, and defendant was convicted of the cocaine offense. However, at the 1988 trial, defendant was not prosecuted for the prescription drug offenses, and the prescription drug offenses did not constitute an essential element of the cocaine offenses. Accordingly, defendant's assertion that the Double Jeopardy Clause bars his convictions in this case is meritless.
 
 C.
 
 32
 Defendant Johnson next argues that the district court erred in denying his motion to suppress evidence seized from the car in which he had been a passenger prior to his arrest. On May 9, 1988, defendant was a passenger in a car owned and driven by Thomas Mahachek. Defendant's wife, Linda Johnson, and a small child were also passengers in the car. As described above, defendant obtained prescriptions from Dr. Flake's office. He was picked up at Dr. Flake's office by Mahachek and driven to the party store parking lot where he met with Raheem, gave her some documents, and was then driven to a pharmacy. Defendant was arrested as he left the pharmacy pursuant to a warrant. At that time, the car, occupied by Mahachek, Linda Johnson, and the small child, was located 30 or 40 feet away and around a corner.
 
 
 33
 As the arresting agent, Agent Stejskal, approached the car, he observed a small yellow pad and a larger yellow pad on the rear shelf of the car. Based upon his experience, Agent Stejskal believed that these documents, which were in plain view, were "verification lists." Verification lists are used in the illegal drug business to keep track of what patient names are used to obtain illegal drugs on a particular date. Since Agent Stejskal observed the "verification lists" in plain view, and because he expected other evidence and documents to be found in the car, he performed a warrantless search of the entire automobile.
 
 
 34
 The evidence from the search of the car which was introduced at the trial in this case consisted of two yellow notepads and nine prescriptions written by Dr. Flake, which were found inside the small yellow notepad. Also introduced at the trial were seven blank prescription forms from Dr. Flake and $100 in "buy" money which was found in Linda Johnson's purse.
 
 
 35
 For purposes of arguing the motion to suppress, the parties stipulated that the two yellow notepads and the nine prescriptions written by Dr. Flake were defendant's property and that he had standing to challenge their seizure. However, the parties did not stipulate that defendant had standing to challenge the evidence seized from his wife's purse, and the defense presented no evidence showing that defendant had an expectation of privacy in his wife's purse.
 
 
 36
 Assuming that defendant had standing to challenge the admissibility of the evidence seized from his wife's purse, it is clear, as found by the district court, that the presence of the verification lists created probable cause for the search of the entire vehicle for other documents and "buy" money. In United States v. Ross, 456 U.S. 798 (1982), the Supreme Court held that probable cause to search a vehicle authorizes a warrantless search of the entire vehicle, including all containers that may conceal the objects of the search. In this case, Agent Stejskal observed the "verification lists" in plain view. Thus, he had probable cause to search the vehicle. See Texas v. Brown, 460 U.S. 730 (1983) (where the agent testified that his experience told him that green opaque balloons observed in the car from the outside were incriminating and the district judge found that the agent's testimony was credible, probable cause existed to search the vehicle). Moreover, because Linda Johnson's purse could contain the objects of the search, namely, cash, prescriptions, and verification lists, her purse was properly searched.
 
 
 37
 Additionally, defendant argues that since he was under arrest and the other individuals were outside the car, the agents were required to immobilize the car and obtain a search warrant. In this regard, defendant places great weight on Agent Stejskal's testimony that he could have found a pay phone and attempted to call a magistrate for a search warrant for the car. However, the "automobile exception" to the requirement for a warrant simply requires probable cause and a lawfully stopped motor vehicle. The "inherent mobility" of a car justifies a warrantless search, even if the car is in fact immobilized and exigent circumstances no longer exist. See United States v. Johns, 469 U.S. 478, 484 (1985). Accordingly, the district court did not err in denying defendant's motion to suppress the evidence seized from the warrantless search of the automobile.
 
 D.
 
 38
 Finally, defendant Johnson challenges the sentence imposed by the district court. First, defendant argues that the district court erred in failing to reduce his total offense level by two levels for his acceptance of responsibility pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3E1.1.
 
 
 39
 A district court's refusal to credit a defendant with acceptance of responsibility is subject to a clearly erroneous standard of review and is reversible only in extraordinary circumstances when the decision is without foundation. United States v. Downs, 955 F.2d 397, 400 (6th Cir.1992). Moreover, a defendant bears the burden of proof, by a preponderance of the evidence, that he is entitled to a downward departure. United States v. Kingston, 922 F.2d 1234, 1240 (6th Cir.1990), cert. denied, 111 S.Ct. 2054 (1991).
 
 
 40
 Defendant asserts that his post-arrest statement to Agent Stejskal and his testimony from the 1988 cocaine trial as proof that he accepted responsibility. However, during his post-arrest statement, defendant first denied any involvement in the crime at all. Thereafter, he told Agent Stejskal that he had committed no crime because he was selling the prescription for the same price he was paying Dr. Flake. Furthermore, defendant's prior testimony during his 1988 trial was given in an attempt to obtain an acquittal on the cocaine trafficking charges against him. Furthermore, during the 1988 trial, defendant also maintained that he was not selling prescriptions because he was charging purchasers the same amount for the prescriptions that Dr. Flake charged him.
 
 
 41
 Defendant also argues that the government admitted that he was entitled to the reduction for acceptance of responsibility when it entered into a plea agreement providing for a reduction. However, the plea agreement was rejected by the district court. Moreover, in an addendum to the presentence report, the probation officer reported that
 
 
 42
 the defendant provided a statement in which he accepts no responsibility whatsoever.... [H]e indicates that the doctor gave him a prescription for himself and asked him to hand another prescription to Aulenthia Raheem, as she was in the waiting room. He indicated that he didn't know what the prescription was, didn't even look at it and did not know Aulenthia Raheem.
 
 
 43
 J.A. 52. Further, at sentencing defendant stated:
 
 
 44
 Your Honor, I was not selling prescriptions, number one. I was seeing the doctor and getting prescriptions for myself for my habit.
 
 
 45
 J.A. 298. Accordingly, the district court's denial of a downward departure for acceptance of responsibility was not clearly erroneous.
 
 
 46
 Second, defendant argues that the district court erred in enhancing his total offense level by two levels for being an organizer, leader, or manager under U.S.S.G. § 3B1.1(c). The government bears the burden of establishing the factors leading to a sentence enhancement by a preponderance of the evidence. See United States v. Rodriguez, 896 F.2d 1031, 1033 (6th Cir.1990). The district court's findings in this regard are entitled to due deference on appeal and are subject to reversal only if clearly erroneous. United States v. Perez, 871 F.2d 45, 47-48 (6th Cir.), cert. denied, 492 U.S. 910 (1989).
 
 
 47
 Defendant complains that the district court's decision to enhance his sentence is without foundation because it is primarily based on testimony presented at Dr. Flake's sentencing on December 19, 1991. However, the district court properly considered the evidence from Dr. Flake's sentencing. In United States v. Petty, 982 F.2d 1365 (9th Cir.1993), the Ninth Circuit rejected the argument that the Confrontation Clause bars the consideration of hearsay statements at sentencing, stating:
 
 
 48
 In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. 18 U.S.C. § 3661. Any information may be considered, so long as it has "sufficient indicia or reliability to support its probable accuracy."
 
 
 49
 Id. at 1367 (citing United States v. Marshall, 519 F.Supp. 751 (D.Wis.1981), aff'd, 719 F.2d 887 (7th Cir.1983)). See also United States v. Silverman, 976 F.2d 1502, 1511 (6th Cir.) (en banc) (accord), petition for cert. filed, No. 92-7020 (Dec. 21, 1992).
 
 
 50
 In this case, the statements from Dr. Flake's sentencing hearing have an indicia of reliability. The statements were made under oath before the same judge who presided at defendant's sentencing, and the judge found the testimony to be credible. Furthermore, the district court provided defendant with a copy of the testimony from Dr. Flake's sentencing hearing prior to defendant's sentencing hearing. Thus, defendant had notice that the district court intended to rely on the testimony.
 
 
 51
 At Dr. Flake's sentencing hearing, Dr. Flake testified that he initially began treating defendant for a legitimate purpose. Subsequently, however, defendant became armed and violent. Dr. Flake was informed, correctly, that defendant had previously been convicted of murder, and on occasions, Dr. Flake was faced with defendant brandishing a .38 caliber revolver, a submachine gun, and various pipe guns. J.A. 361.
 
 
 52
 Dr. Flake's wife indicated that he was an extremely passive individual who avoided conflict. Dr. Flake's daughter testified that the offense was totally out of character for her father and that he was led into the offense by his advancing age, 69, and his fear of reprisals from defendant. Furthermore, the record reflects that defendant contacted Dr. Flake when he wanted prescriptions written and that he remained at Dr. Flake's offices while the prescriptions were written. Lastly, there is no evidence that Dr. Flake had any contact with or even knew how to contact Raheem. In this case, the district court judge had the opportunity to hear all the evidence and to determine the credibility of Dr. Flake, his wife, his daughter, and the defendant. Based upon the record in this case, we conclude that the enhancement of defendant's sentence for his role in these offenses was proper as the court's findings on this issue were not clearly erroneous.
 
 
 53
 Third, defendant argues that the district court abused its discretion in making his 1992 sentence imposed in this case consecutive to the sentence imposed for his 1988 cocaine trafficking conviction. Defendant asserts that the district court imposed the consecutive sentence as a punishment for his going to trial. Defendant had entered into a plea agreement with the government which provided that any sentence imposed in this case would be concurrent with the sentence from his 1988 conviction. However, the district court rejected the plea agreement as too lenient, thereby resulting in defendant's proceeding to trial before a jury.
 
 
 54
 A district court's imposition of a sentence consecutive to an undischarged sentence is reviewed for an abuse of discretion. See, e.g., United States v. Gibson, 896 F.2d 206, 210 (6th Cir.1990). Defendant asserts that no reason for the imposition of a consecutive sentence appears in the record and, therefore, that the sole reason for the sentence is punitive. However, given the district court's rejection of the plea agreement as too lenient, the district court had the discretion to impose a sentence longer than defendant would have received under the plea agreement. In this connection, the district court also noted that defendant was on bond for the cocaine offense when he committed these offenses. The district court was therefore concerned that defendant should serve some incremental prison time for these new offenses. See U.S.S.G. § 5G1.3(c) ("the sentence for the instant offense shall be imposed to run consecutively to the prior unexpired term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense"). Furthermore, in light of defendant's prior record as well as his role in these offenses, the district court was within its discretion in ordering in its sentence that defendant's incremental prison time significantly exceed the sentences imposed on his co-defendants, namely, 40 months for Raheem and 36 months for Dr. Flake. Accordingly, defendant's assertion that the district court abused its discretion in imposing a sentence consecutive to his undischarged term of imprisonment is meritless.
 
 III.
 
 55
 For the reasons stated, the district court's judgment of conviction and the sentence entered thereon are AFFIRMED.