ACCEPTED
03-14-00559-CR
4993457
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/22/2015 4:04:26 PM
JEFFREY D. KYLE
CLERK

## No. 03-14-00559-CR

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/22/2015 4:04:26 PM
JEFFREY D. KYLE
Clerk

In The Court of Appeals
For The Third Court of Appeals District
Austin, Texas

**Zane Lynn Barton,**
*Appellant,*
**v.**
**The State of Texas,**
*Appellee.*

ON APPEAL FROM THE 274th DISTRICT COURT, HAYS
COUNTY, TEXAS TRIAL COURT CAUSE NO. CR-13-0614

**BRIEF FOR APPELLANT**
**ORAL ARGUMENT REQUESTED**

Amanda Erwin
State Bar No. 24042936
109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804
amanda@theerwinlawfirm.com
*Counsel for Zane Lynn Barton*

## Identity of Parties and Counsel

**Appellant:**

Zane Lynn Barton

**Appellate Counsel:**

Amanda Erwin
The Erwin Law Firm, L.L.P.
109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804

**Trial Counsel:**

Jesus "Gabriel" Hernandez
507th West 10th Street
Austin, Texas 78701
Telephone: (512) 964-9424

Tracy Reyes Franklin
Behr law Firm
1920 Corporate Drive, Suite 108A
San Marcos, Texas 786666
Telephone: (512) 353-5555

**Appellee:**

The State of Texas

**Appellate Counsel:**

Laura Garcia and Brian Erskine
Hays County District Attorney's Office
712 Stagecoach Trail, Suite 2057
San Marcos, Texas 78666
Telephone: (512) 393-7600

**Trial Counsel:**

Laura Garcia and Brian Erskine
Hays County District Attorney's Office
712 Stagecoach Trail, Suite 2057
San Marcos, Texas 78666
Telephone: (512) 393-7600


**Trial Judge:**

Hon. Gary L. Steel

# Table of Contents

**Page**

Identity of Parties and Counsel…………………..………………..ii

Table of Contents………………………………..…………………..iv

Index of Authorities………………………………..……………….v

Statement of Case…………………………………………………..1

Statement of Issues …………………………………………….…..1

Oral Argument Requested………………………..……………….2

Statement of Facts…………………………………..……………..2

Summary of the Argument……………………..…………………11

Pint of Error One………………………………………………..11

Standard of Review……………………………………………….11

Acts of Deficient Performance………………………..…………..15

Prejudice……………………………………………………...20

Prayer……………………………………………………………..23

Certificate of Service………………………..……………………25

Certificate of Word Limit Compliance………………..………….26

# Index of Authorities

| Cases | Page |
|---|---|

*Andrews v. State*, 159 S.W.3d 98 (Tex.Crim.App. 2005)……….……20

*Bell v. Cone*, 535 U.S. 685 (2000)………………………………………..13

*Bird v. State*, 527 S.W.2d 891, 893 (Tex.Crim.App. 1975)………….20

*Burnett v. State*, 88 S.W.3d 633 (Tex.Crim.App. 2002)………..........22

*Collier v. Turpin*, 155 F.3d 1277 (11th Cir. 1998)…………………....13

*Ex parte Argent*, 393 S.W.3d 781 (Tex.Crim.App. 2013)…………...18

*Ex parte Martinez*, 195 S.W. 3d 713 (Tex.Crim.App. 2006)………..15

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003)………………..14

*Jackson v. State*, 766 S.W.2d 504 (Tex.Crim.App. 1985)…………...15

*Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984)………………...14

*McMann v. Richardson*, 397 U.S. 759 (1970)………………………….12

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999)………………….....14

*O'Neal v. McAninch*, 513 U.S. 432 (1995)…………………………….22

*Profitt v. Waldron*, 831 F.2d 124 (5th Cir. 1987)…………………….14

*Strickland v. Washington*, 466 U.S. 668 (1984)………………..........12

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004)………........13

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000)………….......14

*Wiggins v. Smith*, 539 U.S. 510 (2003)………………………………..13

*Wilkerson v. State*, 726 S.W.2d 542 (Tex. Crim. App. 1986)……….12

**Statutes**

TEX. R. APP. 21.4…………………………………………………..18

## Statement of the Case

This is an appeal from a criminal proceeding. The Appellant, Zane Barton, is currently incarcerated. On August 7, 2013, a Hays County grand jury returned an indictment charging Mr. Barton with Aggravated Assault Serious Bodily Injury, enhanced to a first-degree felony for using a deadly weapon during the commission of the assault, and for committing family violence. (1 CR 12). On August 19, 2014, after being duly selected, a jury was sworn. (3 RR 26). Mr. Barton entered a plea of not guilty to the offense as alleged in the indictment. (3 RR 32). The jury subsequently found Mr. Barton guilty of the offense as alleged in the indictment. (1 CR 88). The jury assessed punishment at life in the Institutional Division of the Texas Department of Criminal Justice, and further assessed a ten thousand (10,000.00) dollar fine. (1 CR 101). Mr. Barton was sentenced in opened court on August 21, 2014. (1 CR 102). The trial court certified Mr. Barton's right to appeal. (1 CR 104). The Appellant's notice of appeal was timely filed. (1 CR 106).

## Statement of the Issues

Point of Error One:

The Appellant was denied the effective assistance of counsel as a result of the Appellant's trial counsel's multiple acts of deficient performance.

**Oral Argument Requested**

The Appellant respectfully request that oral argument be granted in this case.

**Statement of Facts**

On August 19, 2014, after being duly selected, a jury was sworn. (3 RR 26). Mr. Barton entered a plea of not guilty to the offense as alleged in the indictment. (3 RR 32). The State made an opening statement to the jury, as did the Appellant's trial counsel. (3 RR 32-36).

The State called Matthew Daenzer, a police officer with the San Marcos Police Department, as its first witness. (3 RR 37-38). Officer Daenzer testified that on April 23, 2013, he was dispatched to the Central Texas Medical Center for a possible robbery. (3 RR 39-41). While at the Hospital, Officer Daenzer spoke with the alleged victim in the case, Stefanie Hunt. (3 RR 20). Officer Daenzer testified that he observed multiple bruises on Ms. Hunt's body, cuts on Ms. Hunt's cheeks, and a large laceration across Ms. Hunt's throat. (3 RR 42). The State admitted photographs that Officer Daenzer took of Ms. Hunt's injuries. (3 RR 42-43). Officer Daenzer further testified that Ms. Hunt relayed to him that she received the injuries from a black male mugging her. (3 RR 53).

The State then called Rich Mizanin, a patrol sergeant with the San

Marcos Police Department, who was the lead detective on the case against Mr. Barton. (3 RR 36-37). Sergeant Mizanin testified that detectives with the Hays County Sheriff's office conducted an investigation at the Wal-Mart where Ms. Hunt claimed she was attacked. (3 RR 80-81). While conducting the investigation, the detectives were approached by Mr. Barton, who stated that his wife was missing. (3 RR 80-81). Mr. Barton was transported to the San Marcos Police Department so he could be interviewed. (3 RR 83). Detective Mizanin testified that during the interview, Mr. Barton was extremely fidgety and uncomfortable, and that he was mumbling things to himself while he was alone. (3 RR 85). Detective Mizanin further stated that Mr. Barton asked if he was going to be arrested, and that when an officer who walked by with a ticket book, Mr. Barton questioned him, "is that for me?" (3 RR 85). Mr. Barton relayed to officers that he was working construction from 9:30 in the evening to 5:30 in the morning the evening in question. (3 RR 67). Mr. Barton further relayed that he and Ms. Hunt had been living under a bridge in San Marcos, and described the area. (3 RR 69).

Sergeant Mizanin went to Brackenridge Hospital, and met with Ms. Hunt, who told Sergeant Mizanin that a black male assaulted her. (3 RR 76). Sergeant Mizanin testified that it appeared to him that the word "ZANE" had

3

been cut into the Ms. Hunt's skin on her back and leg. (3 RR 79).

Sergeant Mizanin spoke with a black male, who was staying at a Budget Inn in New Braunfels, Texas, and eliminated him as a suspect in the case. (3 RR 83-84). Next, Sergeant Mizanin reviewed all of the Wal-Mart surveillance tapes, and was unable to find any footage showing Ms. Hunt being assaulted. (3 RR 85-86).

Approximately a week later, Sergeant Mizanin received a telephone message from Mr. Barton, questioning what was going on with the case, as well as a telephone message from Ms. Hunt's father, Keith Hackenburg. (3 RR 88-89). Sergeant Mizanin made contact with Mr. Hackenberg, who advised that Ms. Hunt wanted to tell law enforcement the truth about what had happened to her. (3 RR 89). Ms. Hunt provided a written statement, as well as an oral statement over the telephone, describing Mr. Barton as the offender. (3 RR 89).

After speaking with Ms. Hunt, Sergeant Mizanin went out to the scene where Ms. Hunt described the assault to have occurred, and took photographs. (3 RR 90-100). Sergeant Mizanin attempted to make contact with the man who found Ms. Hunt on the side of the road and took her to the Central Texas Medical Center, but was unable to locate the subject. (3 RR 104-105).

The State then called Keith Hackenburg, Ms. Hunt's Father, as a witness. (3 RR 129). Mr. Hackenberg testified that he and his wife went to pick Ms. Hunt up from the Hospital in Austin and brought Ms. Hunt back to their home in Hockley, Texas. (3 RR 130-131). Mr. Hackenburg testified that several days after bringing his daughter home, she opened up and told him that Mr. Barton assaulted her. (3 RR 133-134).

The State then called Ms. Stefanie Hunt, the alleged victim in the case. (3 RR 143). Ms. Hunt testified that she and Mr. Barton first dated back in high school. (3 RR 143). Ms. Hunt testified that she reconnected with Mr. Barton on Facebook sometime in 2012. (3 RR 144). Sometime after reconnecting, Ms. Hunt left her home in Hockley, Texas with Mr. Barton to go to Llano, Texas. (3 RR 146). The two used Ms. Hunt's parent's truck to travel, which eventually ran out of gas and was abandoned by them in Austin, Texas. (3 RR 146). The two made their way to New Braunfels, Texas on foot, staying under bridges or anywhere they could find. (3 RR 147). At this time neither Ms. Hunt nor Mr. Barton were employed. (3 RR 147).

Ms. Hunt and Mr. Barton eventually ended up in San Marcos, Texas, after a police officer in New Braunfels dropped them off in the city limits. (3 RR 148). During their time in San Marcos, the two lived under a bridge

with big white rocks. (3 RR 150). Ms. Hunt testified that her injuries were sustained form Mr. Barton assaulting her over a period of time. (3 RR 151).

The alleged assault began after the two went to eat pizza at a Little Caesars, and Mr. Barton accused Ms. Hunt of looking at someone while inside of the restaurant. (3 RR 151-152). Mr. Barton first threw rocks at Ms. Hunt's head, and then told Ms. Hunt to stand with her hands on the wall while Mr. Barton hit Ms. Hunt on her back and legs with a belt. (3 RR 153). Mr. Barton then hit Ms. Hunt with rocks again. (3 RR 155). Ms. Hunt managed to run off, and a police officer stopped on the side of the road, but instead of going with the police officer, Ms. Hunt went back to Mr. Barton. (3 RR 155). Mr. Barton then hit Ms. Hunt with is belt buckle all over Ms. Hunt's body, including Ms. Hunt's face and eyes. (3 RR 156, 159). Ms. Hunt sustained a gash to the top of her head from Mr. Barton throwing a rock at Ms. Hunt's head. (3 RR 158-159). Mr. Barton cut Ms. Hunt's hand with a box cutter, and told her that, "this is what it's going to feel like." (3 RR 161). Mr. Barton then cut X marks on Ms. Hunt's cheeks with a box cutter, and stated, "do you think anybody is going to think you're pretty now, do you think anybody is going to want you?" (3 RR 163). Mr. Barton then instructed Ms. Hunt to get on her hands and knees, and Mr. Barton cut Ms. Hunt's neck. (3 RR 164). Mr. Barton handed Ms. Hunt his sweater to

6

wrap around her neck so she wouldn't lose too much blood. (3 RR 165).

Ms. Hunt then went to sleep and woke up the next morning. (3 RR 166). Mr. Barton asked Ms. Hunt if she needed to go the hospital, and she responded yes. (3 RR 168). Mr. Barton was crying, because he couldn't go to the hospital with Ms. Hunt. (3 RR 168). Ms. Hunt told Mr. Barton that she would make something up about how she sustained her injuries, specifically, that a black man by the Wal-Mart mugged her. (3 RR 169).

Ms. Hunt started walking down the road, and a man stopped in his vehicle and drove Ms. Hunt to the hospital. (3 RR 171). While at the hospital, Ms. Hunt allegedly told officers a fabricated story of how she sustained her injuries. (3 RR 171). Ms. Hunt's family came and picked her up and brought her back to their home in Hockley, Texas. (3 RR 173). Eventually, Ms. Hunt told her family that Mr. Barton had assaulted her. (3 RR 174). Ms. Hunt testified that she still has scars on her hand, her face, and her neck from the assault. (3 RR 175-176).

On cross examination, Ms. Hunt testified that during the time she reconnected with Mr. Barton on Facebook that she was still married, but that her husband was in prison. (3 RR 179). After reconnecting, Ms. Hunt went to visit Mr. Barton in Whitesboro, Texas. (3 RR 182). Mr. Barton then came to Hockley, and met with Ms. Hunt's parents to get permission for the

two to leave together. (3 RR 183). Ms. Hunt's husband was upset that Mr. Barton was with his wife in Hockley. (3 RR 185).

Ms. Hunt testified that Mr. Barton and her self used drugs while they were staying in Llano, Texas. (3 RR 192). Ms. Hunt testified that she and Mr. Barton also drank together. (3 RR 194). Ms. Hunt further testified that she and Mr. Barton took meth together in a hotel in New Braunfels, Texas, with two other people. (3 RR 194).

Ms. Hunt agreed that at some point during the assault she ran away and made contact with an officer, but went back to Mr. Barton instead of getting help. (3 RR 203-204).

The State then called Laurie Townsend, a nurse at the Central Texas Medical Center. (3 RR 208-209). Ms. Townsend testified that on April 23, 2013, Ms. Hunt was her patient. (3 RR 210). Ms. Townsend testified that she considered Ms. Hunt's injuries to be very dangerous. (3 RR 214). Ms. Townsend further testified that the injury on Ms. Hunt's neck could create a substantial risk of death for Ms. Hunt, as well as disfigurement. (3 RR 214, 215). On cross-examination, Ms. Townsend testified that Ms. Hunt listed the Appellant, Zane Barton, as her spouse and emergency contact. (3 RR 231).

The State then called Dr. Nicholas Nunez, an emergency medicine

physician at The University Medical Center at Brackenridge. (4 RR 8). On April 23, 2013, Ms. Hunt was Dr. Nunez's patient. (4 RR 9-10). Dr. Nunez testified that Ms. Hunt's laceration on her neck created a substantial risk of causing death. (4 RR 12). Dr. Nunez further testified that a tool of some sort could only inflict Ms. Hunt's laceration on her neck. (4 RR 17).

The State and the Appellant's trial counsel both rested their cases, and the State and the Defense then both closed their cases. (4 RR 31). The jury charge was read aloud in open court, and the State and Defense made closing arguments. (4 RR 34-68). The jury found the Appellant guilty as charged. (4 RR 70).

The punishment phase commenced, and Mr. Barton pled true to the enhancement paragraph in front of the jury, which then enhanced the punishment range in the case to 15 to 99 years. (4 RR 74). The State made an opening statement. (4 RR 74-76).

The State then called Ms. Hunt, the alleged victim. (4 RR 77). Ms. Hunt detailed to the jury the first time Mr. Barton hit her, which was when they were dating in high school. (4 RR 79). Ms. Hunt dropped out of high school and Mr. Barton and her moved out of Hockley, Texas. (4 RR 81). During this time period the two were living in Ms. Hunt's vehicle. (4 RR 81). Ms. Hunt testified that Mr. Barton would burn Ms. Hunt's arms with

cigarettes and hit Ms. Hunt's knees with five or ten pound barbells. (4 RR 82). While Mr. Barton was at work, Mr. Barton made Ms. Hunt stay inside of her vehicle's trunk. (4 RR 83). At some point, Mr. Barton got arrested, and Ms. Hunt went back to live with her family in Hockley, Texas. (4 RR 85).

Ms. Hunt then reconnected with Mr. Barton many years later through Facebook. (4 RR 86). Mr. Barton began getting physical with Ms. Hunt again, (4 RR 87). Ms. Hunt testified that at some point, Mr. Barton allegedly talked about killing someone to get his or her vehicle. (4 RR 99).

The State then called Mr. Hackenberg, Ms. Hunt's father. (4 RR 101).

The State rested, and the Defense announced to the jury and the trial court that Mr. Barton was going to testify, but questioned the trial court if they should proceed now or break for the day. (4 RR 113). The trial court instructed the jury that they would break for the day and resume the punishment hearing in the morning. (4 RR 113-114). The next morning, the Defense stated that Mr. Barton was no longer going to testify to the jury, and rested its case. (5 RR 4, 9).

The trial court read the charge of the court regarding punishment. (5 RR 10). The State and the Defense made closing statements, and the jury subsequently sentenced the Appellant to life in the Texas Department of

Criminal Justice, Institutional Division, and further assessed a ten thousand (10,000) dollar fine. (5 RR 13-35).

## Summary of the Argument

The Appellant, Mr. Barton, contends that he was denied the effective assistance of counsel, as a result of his trial counsel's multiple acts of deficient performance. Furthermore, the Appellant asserts that this denial of effective assistance of counsel resulted in prejudice. Mr. Barton seeks this Honorable Court to reverse the judgment of conviction and/ or punishment below, or in the alternative, remand the case to the trial court to determine Mr. Barton's competency and/or sanity at the time of the commission of the offense, and/ or to determine whether trial counsel conveyed the plea offer to Mr. Barton.

## Point of Error One

The Appellant was denied the effective assistance of counsel, as a result of the Appellant's trial counsel's multiple acts of deficient performance.

## The Standard of Review

A defendant in a criminal case is entitled to effective assistance of counsel. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). Furthermore, counsel must act within the range of competence demanded of counsel in criminal cases. *McMann v. Richardson*, 397 U.S. 759 (1970).

11

In *Strickland v. Washington*, the United States Supreme Court established the federal constitutional standard for determining whether counsel rendered reasonably effective assistance. *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant first must show that counsel's performance was deficient; that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id*. at 687. Second, the defendant must show that the deficient performance prejudiced the defense; that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result. *Id*. at 692. The defendant must identify specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id*. at 690. The reviewing court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id*. Ultimately, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Counsel's performance is measured against an "objective standard of reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539

U.S. 510, 527 (2003). The prejudice an applicant must show is by less than a preponderance of the evidence because "[t] he reasonable-probability standard is not the same as, and should not be confused with, a requirement that a defendant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 9 (2004).

While the Appellant must overcome the "strong presumption" that counsel's challenged conduct "might be considered sound trial strategy," counsel may not insulate challenged conduct from review by claiming it was "strategic." *Bell v. Cone*, 535 U.S. 685, 698 (2000). Whether counsel's conduct was strategic is a question of fact, but whether it was objectively reasonable is a question of law, to which no deference is owed. *Collier v. Turpin*, 155 F.3d 1277, 1290 (11th Cir. 1998). As explained in *Strickland*, the issue of ineffective assistance of counsel is not a question of "basic, primary, or historical fact," and "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Strickland*, 466 U.S. at 698. Moreover, strategic choices are entitled to deference only to the extent they are based on informed decisions. *Id*. at 690-691.

This Court is "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). *See also Hardwick v. Crosby*, 320 F.3d 1127, 1186 (11th Cir. 2003) ("The mere incantation of 'strategy' does not insulate attorney behavior from review."); *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984) ("even deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance"); *Washington v. Hofbauer*, 228 F.3d 689, 704 (6th Cir. 2000) ("the label 'strategy' is not a blanket justification for conduct which otherwise amounts to ineffective assistance of counsel"); *Profitt v. Waldron*, 831 F.2d 1245, 1248 (5th Cir. 1987) ("This measure of deference [to a claim of trial strategy] must not be watered down into a disguised form of acquiescence.").

Lastly, it is possible that a single egregious error of omission or commission by appellant's counsel constitutes ineffective assistance of counsel. *Jackson v. State*, 766 S.W.2d 504, 508 (Tex.Crim.App. 1985).

14

## Acts of Deficient Performance

The first act of deficient performance is that Mr. Barton's trial counsel failed to investigate Mr. Barton's mental health in regards to his competency and/or sanity to stand trial.

One necessary facet of effective assistance of counsel is the investigation of the facts and law as applicable to the case; counsel has the duty in every case to make a reasonable investigation or a reasonable decision that an investigation is necessary. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). As the Texas Court of Criminal Appeals explained in *Ex parte Martinez*, "When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex parte Martinez*, 195 S.W. 3d 713, 721 (Tex.Crim.App. 2006). Here, trial counsel was deficient when he made an unreasonable decision to not investigate Mr. Barton's mental health, because there was considerable evidence known to trial counsel that would lead a reasonable attorney to investigate further. *Id*. at 721.

The Appellant had court appointed trial counsel prior to Mr. Hernandez being retained. (1 CR 18). The court appointed trial counsel had filed a motion for Mr. Barton to be evaluated for competency and sanity because

15

there was evidence that would lead a reasonable attorney to investigate further into Mr. Barton's mental health. (1 CR 15). Specifically, in the said motion, the court appointed trial counsel states that there was good cause for the filing the said motion, because Mr. Barton was prescribed psychotropic medications, and further that it was evident from a review of the evidence that there existed valid questions regarding Mr. Barton's mental health. (1 CR 15). This motion was never ruled upon, because there is no order in the trial court's file. (1 CR 15).

The record below further reflects that Detective Mizanin testified that during his interview of Mr. Barton, Mr. Barton was extremely fidgety and uncomfortable, and that Mr. Barton was mumbling things to himself while he was alone. (3 RR 85). Detective Mizanin further stated that Mr. Barton asked if he was going to be arrested, and that when an officer who walked by with a ticket book, Mr. Barton questioned him, "is that for me?" (3 RR 85). Detective Mizanin's testimony indicates that Mr. Barton could be suffering from possible schizophrenia, because he was talking to himself, and could also be suffering from a paranoid personality disorder or another mental health issue because of the paranoid behavior Mr. Barton was exhibiting. (3 RR 85).

Lastly, the fact that Mr. Barton and Ms. Hunt were living under a

bridge in San Marcos, and were homeless during the time frame of the assault, is also a red flag that Mr. Barton may have mental health issues that need to be investigated. (3 RR 69).

The record reflects that Mr. Barton received ineffective assistance of counsel below, when Mr. Barton's trial counsel made the unreasonable decision to not assess Mr. Barton's mental health, because there was considerable evidence that would lead a reasonable attorney to investigate further, including a previously filed motion that was never ruled upon requesting that Mr. Barton's mental health be evaluated. *Id*. at 721.

The second act of deficient performance is that Mr. Barton's trial counsel did not convey the plea offer to Mr. Barton. The record is void of any oral record or written record that Mr. Barton was made aware of the plea bargain in the case and the serious consequences of rejecting such plea bargain.[1] (1 CR 1-114).

Since the time period for a motion for new trial has lapsed, and it was not possible to ascertain this issue before reviewing the full record below, Appellant would respectfully request the Court to remand the case to the trial court on this issue so that a full record can be developed. TEX. R. APP.

---

[1] Appellate counsel spoke with trial counsel and was informed that there was a plea offer of 25 years; Mr. Barton was never made aware of such offer until correspondence with appellate counsel.

21.4.  For, the Appellant contends that there is a reasonable probability that Mr. Barton would have accepted the plea offer, if trial council had not given ineffective assistance, the prosecution would not have withdrawn the offer, and the trial court would not have refused to accept plea bargain.  *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex.Crim.App. 2013).  Mr. Barton contends that he received ineffective assistance of counsel below,  when trial counsel failed to inform him of the plea offer.  (1 CR 1-114).

The last act of deficient performance below is that Mr. Barton's trial counsel announced to the jury during the punishment phase of trial that Mr. Barton would testify, and then the next day did not have Mr. Barton testify. (4 RR 113).  There is absolutely no possible trial strategy involved in this action.  *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999).

The record establishes that Mr. Barton's trial counsel was calling Mr. Barton to testify in that very instant in time, but that the trial court recessed the case to the next day:

MS. GARCIA:  No further witnesses.  The State rests.

THE COURT:   Is the Defense going to call any witnesses during punishment?

MR. HERNANDEZ:  It's going to be Mr. Barton, Your Honor,  So we—I know we talked about the—we didn't have a jury charge ready or a

18

jury pattern ready and we weren't going to give it to the jury today. I didn't know if you want to break for the day and start again with my one witness in the morning before we got it to them.

THE COURT: Okay. Ladies and gentlemen, I am going to ahead and break for the day. (4 RR 113).

The above exchange reveals Mr. Barton's trial counsels' clear intention that he was going to put Mr. Barton on the stand in that very moment in time. (4 RR 113). The only reason that Mr. Barton did not testify before the jury is that the trial court recessed the proceedings to the next day. (4 RR 113). The record does not contain any evidence that something had changed between the moment in time that trial counsel was prepared to put Mr. Barton on the stand and the next morning, when trial counsel did not put Mr. Barton on the stand; therefore there cannot be any strategy behind this action. (4 RR 113-118); (5 RR 9). The Appellant would contend that he was not provided effective assistance of counsel in the punishment phase due to trial counsel's actions. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). For, as the Texas Court of Criminal Appeals articulated in *Andrews v. State*, "When no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record

adequately reflects the trial counsel's subjective reason for acting as she did." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex.Crim.App. 2005). It is basic black letter law that the trial judge and the prosecutor are not allowed to call attention to a defendant's failure to testify, therefore, it must follow that a defendant's own trial counsel should in turn not clumsily highlight the defendant's failure to testify. *Bird v. State*, 527 S.W.2d 891, 893 (Tex.Crim.App. 1975).

### Prejudice

The "prejudice" prong of *Strickland* requires this Court to determine whether counsel's objectively deficient conduct highlighted above was sufficient to undermine its confidence in the verdict, that is, whether there is a reasonable probability that, but for this objectively deficient conduct, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Kyles v. Whitley*, 514 U.S. 419, 430 (1995). The prejudice the Appellant must show is by less than a preponderance of the evidence because "[t]he reasonable-probability standard is not the same as, and should not be confused with, a requirement that the Appellant prove by a preponderance of the evidence that but for error things would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 n. 9 (2004). In assessing prejudice, this Court is

obligated to consider the cumulative effect of the multiplicity of counsel's errors demonstrated in the record below. *Strickland v. Washington*, 466 U.S. 668, 690 (1984).

Regarding trial counsel's failure to investigate Mr. Barton's mental health, there is a reasonable probability that if Mr. Barton's mental health was assessed, that the case would never have gone to trial, that Mr. Barton could have raised the defense of insanity, or that Mr. Barton could have properly assisted trial counsel with defending the case after regaining competency; thus the result of the proceedings below would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

With regard to trial counsel's failure to convey the plea offer to Mr. Barton, there is clearly a reasonable probability that the result of the proceedings below would have been different, because Mr. Barton would have entered into the plea agreement, and therefore would not have gone to trial and received a life sentence. *Id*. at 694.

Lastly, regarding the fact that the jury was told that they were going to hear from Mr. Barton during the punishment phase of trial, and then did not, there is a reasonable probability that the result of the punishment proceedings would have been different if this had not occurred. *Id*. at 694.

21

For, it cannot reasonably be argued that this action could be cured simply from the instruction given by the trial court in the punishment charge; trial counsel admitted to Mr. Barton's egregious behavior in the cross examination of the victim, and in closing statements, and the fact that the jury anticipated during an entire overnight recess that they would hear some sort of remorse or explanation from Mr. Barton the next morning, and then did not, clearly only served to fuel the jury's loathing of Mr. Barton. (4 RR 94); (5 RR 20); *Id.* at 694.

The present case presents in compelling terms "a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. "When a [reviewing] court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995); see also *Burnett v. State*, 88 S.W.3d 633, 638 (Tex.Crim.App. 2002). ("In cases of grave doubt as to harmlessness the [Appellant] must win."). Because this Court must have such grave doubt about whether the Appellant's trial counsels' multiple instances of objectively deficient conduct contributed to Mr. Barton's conviction and punishment, it must grant Mr. Barton a new trial. *O'Neal v. McAninch*, 513 U.S. 432, 445 (1995).

For these reasons Mr. Barton would respectfully request the Court to hold that the cumulative effect of his trial counsel's errors caused "a breakdown in the adversarial process that our system counts on to produce just results" sufficient "to undermine this Court's confidence in the outcome" of the Appellant's trial. *Strickland v. Washington*, 466 U.S. 668, 696 (1984). Mr. Barton contends that if his trial counsel had discharged his duty below, there is a reasonable probability the result of the proceedings would have been different. *Id*. at 694.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Zane Barton, prays this Honorable Court will reverse the judgment of conviction and or punishment below, or in the alternative, remand the case to the trial court to determine Mr. Barton's competency and/or sanity at the time of the commission of the offense, and/ or to determine whether trial counsel conveyed the plea offer to Mr. Barton. Further, Zane Barton prays that this Honorable Court will enter any other relief appropriate under the facts and the law.

Respectfully Submitted,

/s/ Amanda Erwin

_____

Amanda Erwin
The Erwin Law Firm, L.L.P.

23

109 East Hopkins Street, Suite 200
San Marcos, Texas 78666
Telephone: (512) 938-1800
Telecopier: (512) 938-1804
amanda@theerwinlawfirm.com
Attorney for Appellant
Zane Barton
State Bar Number 24042936

**CERTIFICATE OF SERVICE**

Pursuant to TEX. R. APP. P. 9.5, I certify that of April 22, 2015, a copy of this motion was mailed via first class U.S. mail, to the following: Hays County District Attorney's Office, 712 Stagecoach Trail, Suite 2057, San Marcos, Texas 78666.

/s/ Amanda Erwin

_____

Amanda Erwin

**CERTIFICATE OF COMPLIANCE STATING NUMBER OF WORDS IN BRIEF**

Pursuant to Tex. R. App. P. 9.4(i), Appellant certifies that this Appellate Brief contains only 5,749 words, and is therefore compliant with the maximum word limitation allowed by the Honorable Court.

/s/ Amanda Erwin

_____

Amanda Erwin